# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# OWENSBORO DIVISION

CIVIL ACTION NO. 4:14CV-00022-JHM

BEAU BROOKS and TINA BROOKS                                            PLAINTIFFS

V.

CATERPILLAR GLOBAL MINING AMERICA, LLC                 DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion by Plaintiffs, Beau Brooks and Tina Brooks, to preclude the entry of collateral source evidence [DN 122], to preclude reference to undocumented and unwitnessed risk assessments or hazard analyses allegedly performed on the subject roof bolting lines [DN 121], and to strike Dr. David Shraberg as a witness [DN 118]. Fully briefed, these matters are ripe for decision.

## I. BACKGROUND

This is a product-liability case against Defendant, Caterpillar Global Mining America, LLC ("CGM"), arising out of an accident that happened in May of 2013. Plaintiff, Beau Brooks, a Western Kentucky coal miner, sustained injuries to his left hand when his hand was crushed between a rib of coal and a Caterpillar RB220 Roof Bolter. Plaintiffs allege that the injury occurred because Brooks was holding onto the operator handle of the roof bolter that extended his hand beyond the roof and outside the protective operator compartment. Plaintiffs contend that the crush injuries would not have occurred if CGM's operator handle had not been located so close to the edge of the roof bolter's operator compartment that Brooks left hand was left unprotected. Brooks and his wife sued CGM.

## II. DISCUSSION

### A. Collateral Source Evidence [DN 122]

Plaintiffs intend to introduce at trial all medical expenses which have been incurred to date. A substantial portion of the medical expenses have been paid by Beau Brooks' workers' compensation insurance carrier. Plaintiffs seek to prohibit the introduction or reference to the workers' compensation case or the fact that workers' compensation insurance, health insurance, and any other third-party sources not related to the tortfeasor have paid wage and medical benefits relating to Beau Brooks' injuries. Plaintiffs also seek to exclude any evidence of any reduction or charged-off expenses paid by any collateral sources, including workers' compensation and private insurance. Plaintiffs also move to preclude the introduction of evidence regarding the Plaintiff's potential future Affordable Care Act benefits or the fact that his insurance company may pay benefits in the future.

Defendant does not specifically address the collateral source rule; instead, it argues that the Kentucky Workers' Compensation Act precludes the Plaintiffs from introducing evidence at trial of medical bill totals that exceed the amount paid by the Plaintiff's Workers' Compensation carrier, American Zurich Insurance Company, from the date of the accident forward. Defendant argues that Plaintiffs should be precluded from introducing evidence of the gross amount of Beau Brooks' past medical bills to the extent this total exceeds the total amount paid to him pursuant to the Workers' Compensation Act fee schedule. Thus, Defendant seeks an order limiting the amount of the Beau Brooks' past medical bills presented at trial to the amount that has been paid by American Zurich.

In support of its argument, Defendant cites KRS § 342.035(1) which provides: "Periodically, the commissioner shall promulgate administrative regulations to adopt a schedule

of fees for the purpose of ensuring that all fees, charges, and reimbursements under KRS 342.020 and this section shall be fair, current, and reasonable and shall be limited to such charges as are fair, current, and reasonable for similar treatment of injured persons in the same community for like services, where treatment is paid for by general health insurers." Defendant contends that in light of the statute, any medical bills in excess of what was paid on Plaintiff's behalf in accordance with the Workers' Compensation Act fee schedule are not "fair and reasonable" under Kentucky law. As a result, Defendant maintains that at trial the only amount that the jury should be presented regarding the Plaintiff's total past medical expenses is the amount of medical bills paid by the Plaintiff's Workers' Compensation provider. Defendant does not offer any case law in support of its argument.

Kentucky's collateral source rule "precludes courts from reducing a plaintiff's medical damages based on insurance payments made for [his] care, so long as the associated premiums were paid by the plaintiff [himself] or a third party other than the tortfeasor." Fulcher v. United States, 2014 WL 7375557, at *4 (W.D. Ky. Dec. 29, 2014) (citing O'Bryan v. Hedgespeth, 892 S.W.2d 571, 576 (Ky. 1995)). In Baptist Healthcare Systems, Inc. v. Miller, "the Kentucky Supreme Court stated that the collateral source rule 'allows the plaintiff to (1) seek recovery for the reasonable value of medical services for an injury, and (2) seek recovery for the reasonable value of medical services without consideration of insurance payments made to the injured party.'" Dossett v. Wal-Mart Stores East, Ltd. Partnership, 2016 WL 183923, *1 (W.D. Ky. Jan. 14, 2016)(quoting Baptist Health Care Systems, Inc. v. Miller, 177 S.W.3d 676, 682 (Ky. 2005)) Kentucky courts articulate the following policy concerns served by the collateral source rule:

> First, the wrongdoer should not receive a benefit by being relieved of payment for damages because the injured party had the foresight to obtain insurance. Second, as between the injured party and the tortfeasor, any so-called windfall by allowing a double

3

> recovery should accrue to the less culpable injured party rather than relieving the tortfeasor of full responsibility for his wrongdoing. Third, unless the tortfeasor is required to pay the full extent of the damages caused, the deterrent purposes of tort liability will be undermined.

Dossett, 2016 WL 183923, *2 (citing Baptist Health Care Systems, 177 S.W.3d at 683)(citing Schwartz v. Hasty, 175 S.W.3d 621, 626 (Ky. App. 2005))). Based on these policy concerns, the Kentucky Supreme Court held that "'it is absurd to suggest that the tortfeasor should receive a benefit from a contractual arrangement between Medicare and the health care provider. Simply because Medicare contracted with [the plaintiff's] physician to provide care at a rate below usual fees does not relieve a tortfeasor from negligence or the duty to pay the reasonable value of [the plaintiff's] medical expenses.'" Dossett, 2016 WL 183923, *2 (citing Baptist Health Care Systems, 177 S.W.3d at 683-84). This language applies to private medical insurance or workers' compensation insurance. Id. While the Court understands the Defendant's argument, a similar argument has been previously rejected by the district court in Dossett. "[W]hen faced with the often abstruse task of determining reasonable medical damages, the Commonwealth's highest court has expressed a distinct preference in favor of conscientious consumers by requiring tortfeasors to satisfy the full amount of their damages." Dossett, 2016 WL 183923, at *2.

For these reasons, Plaintiffs' motion in limine with respect to this issue is **GRANTED**. Defendant's request to limit the amount of Beau Brooks' past medical bills presented at trial to the amount paid by the workers' compensation carrier is **DENIED**.

### B. Risk Assessments or Hazard Analyses [DN 121]

The record reflects that the RB220 roof bolter was initially designed in 1990 by Simmons Rand Company. The Long-Airdox Company then acquired Simmons-Rand. The Long-Airdox Company added the operator handle to the design in 1998. Long-Airdox was acquired by DBT

4

which was later acquired by Bucyrus International. Bucyrus was acquired by Caterpillar Inc. and Caterpillar then essentially changed Bucyrus's name to CGM. CGM continued to manufacture the RB200 as a Caterpillar product until 2015.

Plaintiffs argue that Fed. R. Evid. 602 and 701 permit a witness to testify regarding a matter if the witness has personal knowledge of the matter. Plaintiffs maintain that CGM intends to call lay witness engineers to testify as to the existence of risk assessment and/or hazard analysis documents regarding the subject roof bolting machines. Plaintiffs contend that all the witnesses admit they have no first-hand knowledge of the existence of the documents and never witnessed the specific risk assessment or hazard analysis being performed. Accordingly, Plaintiffs maintain that the Defendant should be excluded from presenting evidence that a risk assessment or hazard analysis was ever preformed on the subject roof bolting lines, and/or its predecessors by any entities at any time. CGM acknowledges that it has been unable to locate any documents which demonstrate a formal risk assessment was performed on the SR200, RB2-52A, and/or RB 220 roof bolting machines by any of the predecessor companies. Defendant objects to the motion.

Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. "'The threshold for Rule 602 is low[,]' and '[t]estimony should not be excluded for lack of personal knowledge unless no reasonable [factfinder] could believe that the witness had the ability and opportunity to perceive the event that he testifies about.'" Deere & Co. v. FIMCO Inc., 2017 WL 1758069, *2 (W.D. Ky. May 4, 2017)(quoting United States v. Smith, 516 Fed. Appx. 592, 595 (6th Cir. 2013)).

5

1. **Jeff Rector**

The record reflects that when Caterpillar acquired the existing roof bolter product line from Bucyrus, Defendant did not subject the roof bolter to the same risk assessment process that it utilizes on new products that it designs and manufactures itself. Jeff Rector, a 31-year engineer of CGM and its predecessor companies, testified that new product risk assessments are not performed on product lines acquired from predecessor companies, such as Bucyrus, if they are products proven safe over numerous years. (Rector Dep. 32.) Rector further testified that the roof bolter also experienced an engineering design change in 1998 when the operator handle was added to the machine. (Rector at 40.) Rector testified that a risk assessment on the safety of the new design would have been performed when the change was made by Long-Airdox Company. Rector testified that the Defendant has not been able to locate the archived files, including the risk assessment process, performed by Defendant's predecessor companies on the model roof bolter at issue. (Rector 51-52.)

Rector further testified from personal experience regarding the process Long Airdox engaged in during the 1998-time period when company engineers considered changes to equipment, such as adding the handhold to the roof bolter machine. According to Rector,

> I would -- if the information came in and there was a decision made to install something onto a part, such as this hand hold onto this canopy, we would do the engineering change, we would have evaluated and looked at it from all aspects from a risk-time standpoint of -- from a safety, reliability, manufacturability, if --if any of those were affected.
> We would then make the change, if --if everything was okay.
> The -- there would be a EC – ECR number taken out, the change would occur, similar to what's on this drawing, there would be a revision level with a date, along with the ECR number, and then also who made the change, and who approved the change.
> Then based on whether there was a machine going through the shop, that could have this added, or if there was an order

> coming after this date, that this could be added, then it would be at
> that point, and could end up on a machine.

(Rector Dep. 42-43.) Rector indicated that he was personally familiar with the roof bolter group during the period in question and described the type of people involved in the assessments, as well as the documents generated in regard to those assessments. Rector's testimony regarding the risk assessment practice of Caterpillar and its subsidiaries such as Long Airdox and CGM is based on his personal experience and complies with the guidelines of Fed. R. Evid. 602.

### 2. Jeff Looney

Similarly, Jeff Looney, a 26-year product engineer of CGM and its predecessor companies, testified as to his own personal experience regarding his engineering position. Looney began his engineering career with Simmons Rand in 1988 and stayed with all the predecessor companies. He left Caterpillar in 2014. Looney testified that the roof bolter was originally designed by Simmons Rand in 1990 under a chief engineer, Jim Gibson. The record reflects that Gibson passed away before discovery in this case began. At that time, Looney was not on the design team for the roof bolters. He testified that he began working on the roof bolter design team a few years later. He testified that as an engineer he engaged in risk analysis on a day-to-day basis as part of his design. He also testified that MSHA had itself inspected the design of the RB220 tram canopy and handhold. (Looney Dep. at 108-109.) Finally, Looney testified that "there is evidence of risk assessments because there's – there's notice and warning tags and caution tags all over the roof bolter. So there had to have been some kind of risk . . . assessment done, or those wouldn't be there." (Id. at 78-79.) Looney's testimony regarding his day-to-day risk assessment of the roof bolter, MSHA inspections, and the existence of warning tags indicting some kind of initial risk assessment satisfies the personal knowledge requirement of Fed. R. Evid. 602

The Plaintiffs are correct that Looney testified at his deposition that he heard, but did not have first-hand knowledge, that the risk assessment of the subject roof bolter was done in Bristol, Virginia in 1990 and heard that it had been documented. (Looney Dep. at 30-32). However, it does not appear from Defendant's response to the motion in limine that it intends to seek to introduce this testimony from Looney who is testifying as a lay witness. Notwithstanding, at trial, Defendant may establish the existence of the original Simmons Rand risk assessment using admissible evidence. Such evidence may include testimony from a witness who has personal knowledge of the risk assessment or may include Simmons Rand's records reviewed by a witness assuming the records are properly authenticated and a proper foundation is laid. However, it does not include testimony from a witness who lacks personal knowledge. See Industrial Eng'g & Dev., Inc. v. Static Control Components, Inc., 2014 WL 4983912, at *3-4 (M.D. Fla. Oct. 6, 2014).

### 3. Kevin Klein

Kevin Klein, CGM's designated corporate representative for the Fed. R. Civ. P. 30(b)(6) deposition, testified regarding CGM's risk assessment processes during the 2010 to 2013 period including New Product Introduction ("NPI") risk assessments and utilization of integration teams that assessed the products that Bucyrus had in production at the time Caterpillar purchased the company. (Klein Dep. at 16-23.) Specifically, Klein testified that "[t]he RB220 roof bolter in its predecessor form was subjected to a risk assessment." (Id. at 21.) Klein testified that evidence of risk assessments of the predecessor companies of CGM can be seen by examining the Operator and Maintenance Manual ("OMM") of the acquired product. Klein compared the OMM created by CGM for the RB220 and the OMM created by DBT in 2001 for the RB252A finding that the both OMMs were substantially similar and reflected that the risk assessment was

conducted prior to 2001 by predecessor companies. (Id. at 25-26.) Specifically, Klein testified that both manuals instructed the operator to keep himself inside the protection of the canopy, to be aware of his surroundings, and to not hold on to the outer edge of the machine. (Id. at 27.) Klein also testified to the hierarchy of the minimization of risk utilized by Caterpillar and CGM, including what Caterpillar did with the existing Bucyrus products when Caterpillar purchased Bucyrus. (Id. at 28.) Klein also testified regarding the predecessor companies' design reviews which differ from the "fancy processes and procedures" that exists today. (Id. at 58-59.)

In response to Plaintiffs' motion, Defendant suggests that Klein as CGM's designated corporate representative can testify at trial to matters that go beyond his personal knowledge or his personal involvement. However, the case law appears to indicate such testimony would be improper. As noted by the district court in Stryker Corporation v. Ridgeway,

> Although there is a lack of case law in this circuit regarding the issue, the Fifth Circuit has provided guidance. In Union Pump Co. v. Centrifugal Tech. Inc., 404 Fed. Appx. 899 (5th Cir. 2010), Union Pump sought sanctions against the defendant for evidence spoliation. Id. at 903-04. Union Pump's Rule 30(b)(6) designee, Mike Bixler, testified to "numerous matters that were hearsay and not within his personal knowledge." The defendants argued that Bixler improperly testified about a "series of internal investigations," when Bixler "did not conduct the investigations or have any role in them, no written reports were issued as a result of the investigations, and Bixler learned of the facts he testified to solely through conversations with others." Id. at 907.

Stryker Corp. v. Ridgeway, 2016 WL 6585007, at *2 (W.D. Mich. Feb. 1, 2016). The Fifth Circuit in Union Pump, rejected Union Pump's argument and agreed with the defendant stating:

> Federal Rule of Evidence 602 limits the scope of a witness's testimony to matters that are within his or her personal knowledge. Union Pump argues that Bixler was permitted to testify to matters that, although they were not within his own personal knowledge, were within the knowledge of the corporation because Bixler was designated as Union Pump's corporate representative. We disagree. Federal Rule of Civil Procedure 30(b)(6) allows

9

> corporate representatives to testify to matters within the corporation's knowledge during deposition, and Rule 32(a)(3) permits an adverse party to use that deposition testimony during trial. See Brazos River Auth. v. GE Ionics, Inc., 469 F.3d 416, 434 (5th Cir. 2006). However, a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is] hearsay not falling within one of the authorized exceptions." Id. at 435; see also Deutsche Shell Tanker Gesellschaft mbH v. Placid Refining Co., 993 F.2d 466, 473 n. 29 (5th Cir. 1993) (corporate representative is not permitted to repeat "rank hearsay").

Union Pump Co. v. Centrifugal Tech. Inc., 404 Fed Appx. 899, 907-08 (5th Cir. 2010). Other courts have followed a similar approach. See Stryker Corporation v. Ridgeway, 2016 WL 6585007, *2.[1] Thus, contrary to Defendant's argument, Rule 30(b)(6) does not eliminate Rule 602's personal knowledge requirement. Based on this case law, to the extent that such information is based on Klein's personal knowledge and not on hearsay, or to the extent that an exception to the hearsay rule applies, the testimony will be admissible. Stryker, 2016 WL 6585007, at *3; Reuther v. Realtors, 2016 WL 5337839, *3 (E.D. La. Sept. 23, 2016). To the extent that Klein's "testimony is based not on [his] personal knowledge, but instead on hearsay not falling within one of the authorized exceptions, the testimony will be inadmissible at trial." Stryker, 2016 WL 6585007, at *3.

Finally, while the Court agrees in part with the Plaintiffs' argument that the Defendant's witnesses cannot testify to hearsay regarding the formal risk assessments or the hazard analyses

---

[1] Stryker, 2016 WL 6585007, *2 (citing Industrial Eng'g &Dev., Inc. v. Static Control Components, Inc., 2014 WL 4983912, at *4 (M.D. Fla. Oct. 6, 2014) ("Rule 30(b)(6) does not eliminate Rule 602's personal knowledge requirement."); McKesson Corp. v. Islamic Republic of Iran, 185 F.R.D. 70, 79 (D.D.C. 1999) ("Rule 30(b)(6) is intended to streamline the discovery process."); Roundtree v. Chase Bank USA, N.A., No. 13-239, 2014 WL 2480259, at *1 (W.D. Wash. June 3, 2014) ("FRCP 30(b)(6) is inapplicable to the issue of witness testimony at trial."); Cooley v. Lincoln Elec. Co., 693 F. Supp. 2d 767, 791 (N.D. Ohio 2010) (noting that principles behind Rule 30(b)(6) are "designed to relieve burdens imposed on corporate defendants; however, they do not change the rule that a 30(b)(6) designee cannot 'offer any testimony . . . at trial . . . to the extent that information was hearsay not falling within one of the authorized exceptions.'") (quoting Brazos River Auth., 469 F.3d at 435); TIG Ins. Co. v. Tyco Int'l Ltd., 919 F. Supp. 2d 439, 454 (M.D. Pa. 2013) ("Although Rule 30(b)(6) allows a corporate designee to testify to matters within the corporation's knowledge during deposition, at trial the designee 'may not testify to matters outside his own knowledge to the extent that information [is] hearsay not falling within one of the authorized exceptions.'").

performed on the SB200 roof bolter, this does not preclude general testimony about the risk assessment processes engaged in by CGM and its predecessor companies during the period of time in question. The fact that Defendant has been unable to locate archived files documenting the risk assessment processes performed on the subject roof bolter does not establish that no risk assessments were ever performed by Simmons Rand in 1990 or Long Airdox in 1998. As they did in the deposition testimony, Plaintiffs are free to question Mr. Klein and other witnesses about their inability to locate the records in question.

For these reasons, the motion is **GRANTED IN PART AND DENIED IN PART** consistent with this opinion.

### C. Dr. David Shraberg [DN 118]

Plaintiffs move the Court to strike Dr. David Shraberg as a witness at the trial of this matter. As a result of his accident, Beau Brooks filed and later settled a workers' compensation claim against his employer, Armstrong Coal, related to injuries he sustained on the job. Dr. Shraberg was originally retained by Beau Brooks' former employer, Armstrong Coal Company, to offer an opinion in his workers' compensation case. On August 31, 2015, Dr. Shraberg conducted an independent psychiatric evaluation of Beau Brooks to determine if he suffered any permanent psychiatric impairment from the injury that occurred at work. In a report dated September 9, 2015, Dr. Shraberg opined that Beau Brooks has an adjustment disorder of adult life with mood disorder, resolved, with full occupational and psychosocial involvement in the community. (DN 57-3, p. 7.) Dr. Shraberg also opined that Beau Brooks has a Class I level of functioning which equates to a 0% permanent psychiatric impairment. At his first deposition in this current matter, Dr. Shraberg testified that he evaluated Brooks to determine if he had any permanent psychiatric impairments related to the injury he had sustained two years earlier. Dr.

Shraberg determined that Brooks did not suffer "permanent psychiatric impairments from the accident." (Shraberg January 24, 2017, Dep. at 18.) Specifically, Dr. Shraberg testified that he reached the following opinion after evaluating Mr. Brooks:

> Well, the two basic questions, insofar as the permanent psychiatric impairment that would impair his ability to work or interact in the community and his family, I felt he had none from this injury. I think he had recovered from the initial injury psychologically. As far as the second question, which was does he require any ongoing long-term psychotherapy, psychiatric treatment from that injury of May 10, 2013, I believe he had reached maximum medical improvement and did not.

(Id.) Additionally, Dr. Shraberg defined "psychotherapy, psychiatric treatment" to mean medications or therapies. Id. He further testified that Beau Brooks was functioning with the normal limits psychiatrically and that he did not have an anxiety or depressive disorder. (Id. at 25.)

Plaintiffs maintain that Dr. Shraberg's psychiatric analysis and workers' compensation evaluation are not relevant to any claims or defenses raised in this case. According to Plaintiffs, Beau Brooks is not making any claim for any specific psychological impairments or specific medically diagnosed psychological problems in this case stemming from the May 2013 coal mine incident and will not offer any testimony to that effect. (Beau Brooks Aff. ¶¶ 3, 4.) Plaintiffs contend that the mental suffering he has endured relating to his physical injury is different than specific psychological impairments, injuries, and/or medically diagnosed psychological conditions for which Dr. Shraberg assessed him. Accordingly, Plaintiffs maintain that Dr. Shraberg's opinions regarding Beau Brooks' lack of psychological impairments is not relevant to any claims in this case, and Dr. Shraberg should be excluded from offering these opinions at the trial of this case.

Relevant evidence is defined in Fed. R. Evid. 401 as evidence having "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. Fed. R. Evid. 402 provides that "[i]rrelevant evidence is not admissible." "Relevancy is an extremely broad concept. Both the Supreme Court and the Sixth Circuit have noted that the standard set forth in Rule 401 is a liberal one." Hinkle v. Ford Motor Co., 2012 WL 4049477, *1-*2 (E.D. Ky. Sept. 13, 2012)(citing Churchwell v. Bluegrass Marine, Inc., 444 F.3d 898, 905 (6th Cir. 2006)).

In light of Beau Brooks' claim of present and future mental pain and suffering, the Court finds that Dr. Shraberg's testimony is relevant. Count I of the complaint alleges negligence in the design, assembly, manufacture, marketing, and sale of the roof bolter causing Beau Brooks' serious and permanent injuries that he will endure and "continue in the future to endure physical and mental pain and suffering . . . ." (DN 1.) Additionally, medical records from Dr. Brian Cheney suggest that Beau Brooks suffers from an acute, moderate generalized anxiety disorder to which the Plaintiffs' vocational expert Leonard Matheson references in his deposition. (Matheson Dep. At 98.) Similarly, Nurse Practitioner Kristy Fleming indicated in her records that Beau Brooks experiences issues from mood affective disorder. Fleming prescribed Wellbutrin to treat the mood affective disorder. Plaintiffs have listed both Dr. Brian Chaney and nurse practitioner Kristy Fleming as witnesses and have listed the medical and billing records as exhibits. Furthermore, as noted by Defendant, both general anxiety disorder and mood disorder are both specifically recognized and defined by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. In fact, in a second deposition noticed by Plaintiffs in this case, Dr. Shraberg indicated that he had reviewed additional medical records for Beau Brooks. The medical records included additional records from Kristy Fleming, Dr. Chaney, Vanderbilt

13

Medical Center, Liberty Rehabilitation, and pharmacy records. Dr. Shraberg testified that the records did not affect his opinion that he does not believe that Mr. Brooks "has suffered a permanent psychiatric impairment from the accident." (Shraberg Dep. at 10, January 17, 2017, DN 118-6.)

The Court agrees with the Defendant that it is somewhat puzzling for Plaintiffs to assert that Brooks is not claiming any "specific diagnosable psychological injury" and at the same time include, among their witnesses and exhibits, providers who have diagnosed him with "specific diagnosable psychological injury" and have prescribed drugs specifically for the treatment of those psychological conditions. In cases in which a plaintiff asserts present and future mental pain and suffering, expert testimony regarding his current and future psychological or mental condition is relevant. As noted above, Dr. Shraberg specifically testified that Beau Brooks did not have an anxiety or depressive disorder in contrast to the testimony of Dr. Chaney and nurse Fleming. The Court agrees with Defendant that Dr. Shraberg's testimony is relevant because it addresses and rebuts the Chaney/Fleming evidence that suggests a causal link between plaintiff's injury and the psychological conditions that they diagnosed and for which they prescribed him medication. Accordingly, Plaintiffs' motion in limine is **DENIED**.

### III. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion by Plaintiffs, Beau Brooks and Tina Brooks, to preclude the entry of collateral source evidence [DN 122] is **GRANTED**.

**IT IS FURTHER ORDERED** that the motion by Plaintiffs to preclude reference to undocumented and unwitnessed risk assessments or hazard analyses allegedly performed on the

subject roof bolting lines [DN 121] is **GRANTED IN PART AND DENIED IN PART** consistent with this opinion.

**IT IS FURTHER ORDERED** that the motion by Plaintiffs to strike Dr. David Shraberg as a witness [DN 118] is **DENIED**.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

cc: counsel of record

August 8, 2017